UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GENERAL MOTORS LLC

                    Plaintiff,

        v.                                           **DECISION AND ORDER**

LEWIS BROS., L.L.C., SAMUEL LEWIS,                        10-CV-725S
and TIMOTHY LEWIS,

                    Defendants.

## I.  INTRODUCTION

Plaintiff General Motors LLC ("GM") commenced this action on September 2, 2010, asserting twelve claims for relief.  On March 14, 2011, GM moved for a preliminary injunction and appointment of a receiver.  It seeks an order requiring Lewis Bros. to comply with various agreements, and enjoining it from releasing PCB contaminated oil onto GM's Tonawanda Engine Plant property.  Through the appointment of a receiver, GM seeks to prevent Lewis Bros. from diverting assets and depleting resources that should be used to prevent PCB contamination.

Oral argument was held on May 9, 2011, after which this matter was referred to Magistrate Judge Foschio for an expedited discovery schedule relative to GM's motion. When discovery was largely complete,[1] this Court held a series of conferences—during which Defendants retained new counsel—and set a schedule for post-discovery submissions.  This matter is now fully briefed.  For the reasons stated below, GM's motion

---

[1] GM's motion to compel (Docket No. 63) was then pending with the Magistrate Judge.

1

is denied without prejudice.

## II. BACKGROUND

A.    **Factual Background**

1.    ***The Properties***

The two properties at issue here, located in Tonawanda, New York, were at one time owned and operated as a single property by General Motors Corporation ("GMC"). (Docket No. 18, ¶ 1, Ex. 1.)  GMC operated both an Engine Plant and a Forge Facility there.  In 1994, GMC sold the Forge Facility, to American Axle and Manufacturing, Inc. ("AAM").  (Id. ¶¶ 2-5, Exs. 2-3.)

Prior to the sale, the Engine Plant and Forge Facility shared utilities, including a system that draws "mill water" from the Niagara River to cool machinery and for fire protection.  (Docket No. 17 ¶¶ 6,9.)  The used mill water, along with storm water and wastewater from both operations, was collected in a shared storm sewer, sent to a corrugated plate interceptor ("CPI"), and returned to the Niagara River as allowed under a New York State Pollutant Discharge Elimination ("SPDES") permit.  (Id. ¶¶ 5,7,13.)  The CPI is designed  to slow the flow of storm water to allow oily residues to float to the top and sediments to collect at the bottom, so they can be collected and disposed of, rather than discharged.  (Id. ¶ 10.)  The electric power needed to run both facilities was managed by a primary electric substation.  Both the CPI and substation are located on what is now the Engine Plant site.  (Id. ¶ 9.)

GMC and AAM agreed that, following the sale, GMC would continue to provide utilities to AAM via the existing shared systems.  The entities entered into a Tonawanda

Services Agreement (the "Services Agreement"), a Tonawanda Wastewaters and Stormwater Services Agreement (the "Wastewaters Agreement"), an Asset Purchase Agreement ("APA"), and a deed transferring title. (Id. ¶ 9; Docket No. 18 ¶ 7, Exs. 2-5.)

### 2.   *The Subsequent Property Transfer from AAM to Lewis Bros.*

In 2008, AAM entered into a contract to sell the Forge Facility property to Defendant Lewis Bros., and title was transferred on December 3, 2008. (Docket No. 18 ¶¶ 8-9.) At that same time, AAM sold to FormTech the Forge Facilities' operating assets. (Id. ¶ 11.) Lewis Bros. then leased a portion of its newly-purchased property to FormTech.[2] (Id. ¶ 13.) As part of the AAM to Lewis Bros. property transaction, AAM, Lewis Bros., and GMC executed an Assignment Agreement, assigning the Wastewaters Agreement and Services Agreement, as amended and modified, from AAM to Lewis Bros. (Id. ¶ 14, Ex. 10.)

Approximately six months after Lewis Bros. assumed ownership of the Forge Facility site, on June 1, 2009, GMC filed for Chapter 11 bankruptcy protection. (Id. ¶ 15.) Among other things, GMC and certain of its affiliates sought bankruptcy court approval of an "Amended and Restated Master Sale and Purchase Agreement," by which GMC would sell the bulk of its assets to NGMCO, Inc.,[3] which the bankruptcy court refers to as the "New GM." In re GMC, 407 B.R. 463, 473, n.2 (S.D.N.Y. 2009); (Docket No. 31, Ex. 3). Under this transaction, NGMCO, Inc. would acquire the assets covered by the agreement—including the Tonawanda Engine Plant—and create a "new GM" named

---

[2] FormTech operated a forging business at the site until October 2009, when its assets were purchased by HHI FormTech LLC, a subsidiary of Hephaestus Holdings, Inc., a KPS Capital Partners LP portfolio company. (Docket No. 18 ¶ 13.)

[3] NGMCO, Inc. is described as a successor-in-interest to Vehicle Acquisitions Holdings LLC, a U.S. Treasury sponsored Purchaser. In re GMC, 407 B.R. at 473, 482; Docket No. 31 Ex. 3. NGMCO stands for "New General Motors Co."

General Motors Company.  In re GMC, 407 B.R. at 480.  General Motors Company was incorporated on May 29, 2009.  (Docket No. 31, Ex. 1.)  On October 16, 2009, it converted from a corporation to a limited liability company under the name General Motors LLC, the named Plaintiff here.  (Id.)

Soon after GMC's bankruptcy filing, on or about August 26, 2009, FormTech filed for bankruptcy and ceased operations at the Forge Facility.  (Docket No. 18 ¶ 17; Complaint ¶ 32.)

### 3.     Subsequent Activities at the Forge Site

Once FormTech shut down operations, Lewis Bros. solicited bids for the sale of scrap and equipment from the Forge Facility.  (Complaint ¶ 33.)  Demolition and salvage operations commenced in the summer of 2009, and GM attributes a number incidents to that activity.  (See Docket No. 17 ¶¶ 14-15.)

For example, a petroleum discharge occurred on the Forge Facility site on or about August 1, 2009, to which the DEC assigned Spill No. 0911809.  (Docket No. 30 ¶ 2, Ex. 3.)

On August 24, 2009, GM performed a weekly test of storm water in manhole 54A ("MH54A"), located near the Engine Plant's border with the Forge Facility, and detected PCBs at a concentration of 1.94 parts per billion (ppb).  (Docket No. 17 ¶¶ 12, 18.)  GM's SPDES permit limit for PCBs is 0.3 ppb.  (Id. ¶ 14.)  A concentration of 1.31 ppb was detected at MH54A the following week, on August 31, 2009.  (Id. ¶ 19.)

GM's environmental supervisor inspected the surrounding area on September 2, 2009.  He noticed that a pump at the Forge Facility associated with a bermed containment

area had been turned off, allowing water and oily residue to spill over in a heavy rain onto Engine Plant property.  The flooding covered approximately one-half acre of the Engine Plant site.  (Id. ¶ 20.)  Testing of the oily residue showed a PCB concentration of 2800 ppb, while the water in the area tested at 0.2 ppb.  (Id. ¶ 22.)  GM concluded the flooding event likely had not caused the high concentrations of PCBs it had detected in August at MH54A and the CPI.  (Id. ¶ 27.)  In other words, this surface flooding appears to have occurred after August 31.

The Forge Facility's pump was reenergized on September 4, 2009, and GM hired an outside contractor to clean up the oil spill.  (Id. ¶ 24, Ex. 9.)  Following the flood and clean up, on November 23, 2009, GM terminated the Wastewaters Agreement.  (Docket No. 16, ¶ 5, Ex. 2.)

The next incident occurred on January 3, 2010, when fire protection pipes at the Forge Facility froze and ruptured, creating flooding that carried oily waters to the Engine Plant's storm sewer and CPI.  (Docket No. 17 ¶¶ 28-31.)  Testing at the CPI on and after this date did not show elevated levels of PCBs.  (Docket No. 30, Ex. 5.)

On February 11, 2010, the New York State Department of Environmental Conservation ("DEC") directed Lewis Bros. to initiate containment and removal of Petroleum Spill Number 0911809, which had occurred at the Forge Facility property on or about August 1, 2009.[4]  (Docket No. 18 ¶ 30, Ex. 23.)  Samuel Lewis signed a Stipulation on September 24, 2010 in which he agreed that Lewis Bros. would remediate the spill.  (Docket No. 83, ¶ 21, Ex. 17.)  As discussed below, Lewis Bros. failed to do so in a timely

---

[4]  The circumstances surrounding this spill are unclear, but it appears to be related to demolition activities and to involve the oily water that was allowed to pool in open excavations.

manner.

On June 3, 2010, a breaker for an electric feeder to the Forge Facility located in GM's primary substation tripped, interrupting power to the pump house associated with the same containment area that overflowed in September 2009. (Docket No. 17 ¶¶ 33-34.) A few days later, on June 7, 2010, oily water was discovered emanating from the Forge Facility to Engine Plant property. Sampling showed a PCB concentration of 9,800 ppb. (Id. ¶¶ 35-36.) As a result, GM notified Lewis Bros., on June 17, 2010, that it considered Lewis Bros. to have breached the Assignment Agreement, and by that same letter, terminated the Assignment Agreement. (Docket No. 16 ¶ 21 Ex. 4.)

GM shut off all electric service to the Forge Facility on July 9, 2010 (Docket No. 17 ¶ 39), mill and firewater service was turned off on or about August 9, 2010 (id. ¶ 41), and on September 17, 2010, GM placed plugs in the storm sewer flowing from the Forge Facility to the Engine Plant (id. ¶ 48). These were temporary bladder plugs that were inflated to create a seal. (Docket No. 82 ¶¶ 7-8.) On October 5, 2010, heavy rains and a lack of power to the Forge Facility's containment area pumping station and oil water separator caused surface water to again make its way to a fence line between the properties. (Docket No. 17 ¶ 50, Ex. 22.) GM continued to monitor MH54A after it plugged the storm sewer; detections of PCBs ceased on February 7, 2011. (Docket No. 30 ¶ 10, Exs. 5-6.)

GM moved for a preliminary injunction shortly thereafter, on March 14, 2011. According to GM, the Forge Facility is a PCB-contaminated site and Lewis Bros. has not attempted to identify the source of the contamination. (Docket No. 17 ¶¶ 28, 53.) It expresses concern that contaminated water is collecting behind the GM storm sewer plugs

and will migrate below the soil surface to the Engine Plant property.  (Docket No. 30 ¶¶ 11-14.)  GM points to a number of subsequent incidents that it claims call into question Lewis Bros. stewardship and ability to manage the Forge property in an environmentally responsible manner.

First, although Lewis Bros. removed some stored wastes pursuant to its stipulation with the DEC, as of April 2011, oily water remained on the site due to limitations on the retained disposal company's ability to remove and process liquids.  (Id. ¶¶ 26-27, 33.)  In July 2011, the DEC commenced investigation and remediation activities at the Forge Facility relating to the 2010 petroleum spill (Spill Number 0911809) due to Lewis Bros.' inaction.  (Docket No. 83 ¶ 24.)

On or about August 31, 2011, Lewis Bros.' demolition contractor, Titan Wrecking & Environmental, LLC ("Titan") submitted to the Town of Tonawanda a plan to demolish the Forge Facility's main building.  (Id. ¶¶ 2, 4.)  The plan stated Titan would collect any hazardous or potentially hazardous wastes prior to demolition.  (Id. ¶ 4 Ex. 3.)  On November 14, 2011, the DEC contacted Titan to advise that, from its testing of oil in two large transformers on the Forge Facility roof, the oil did not appear to be hazardous. However, testing of oil soaked pads around the base of the transformers showed PCBs at a level of 390 ppm, requiring work in the surrounding area prior to demolition.  (Id. ¶ 6, Ex. 5.)

On or about December 13, 2011, the bladder plug at MH54 failed.  GM decided to permanently seal the sewer connections from the Forge Facility, and completed that work by  December 29, 2011.  (Docket No. 82 ¶¶ 13-14.)

During demolition operations on December 19, 2011, Titan knocked the two

7

transformers from the roof to the ground, spilling their contents.  (Docket No. 83 ¶ 10.)

Although the DEC had stated the oil did not appear to be hazardous, two samples from the

spilled material showed PCB concentrations (Aroclor 1254) of 435,000 mg/kg and 525,000

mg/kg.  (Id. Ex. 8.)  The DEC assigned the incident Spill Number 1112690, and the EPA

also became involved.  (Id. ¶¶ 10, 12.)  On January 31, 2012, a water sample taken from

the GM PL4 parking lot showed Aroclor 1254 at a concentration of 3.44 ppb.  (Id. ¶ 14 Ex.

11.)  The water formed a small pond that overflowed into a GM storm sewer.  (Docket No.

82 ¶ 17.)  Sampling taken at the Engine Plant's CPI on February 1, 2012 was negative for

PCBs, indicating that the sheet flow had not reached GM's SPDES outfall.  (Id. ¶ 21.)

Samples also were taken at the Forge Facility site in February 2011, at MH2 and

the front driveway area.  They showed elevated levels of PCBs.  (Docket No. 83 ¶¶ 15-16,

Exs. 12-13.)  The DEC directed Lewis Bros. and/or Titan to immediately begin treating the

contaminated water with carbon units.  (Id. ¶ 17.)  On March 14, 2012, GM's environmental

supervisor observed two 20,000 gallon tanks, activated carbon canisters, and flexible hose

staged at the Forge Facility.  (Docket No. 82 ¶ 35.)    These components for an on-site

water treatment system were set up by E-COM, an environmental and engineering

consultant company engaged by Lewis Bros.  (Docket No. 93-1 ¶¶ 1-3.)  Due to freezing

temperatures, the system did not operate properly.  (Id.)

In late March 2012, the DEC advised Lewis Bros. and Titan that, effective April 2,

2012, the DEC would initiate cleanup activities with regard to the transformer oil spill and

the earlier Spill No. 0911809 (cleaning of pits, etc.), due to their inadequate responses.

(Docket No. 83 ¶ 18, Ex. 15.)  When problems with the E-COM system were resolved, in

late April 2012, Lewis Bros. began treating storm water in the Forge Facility parking lot, and

then moved on to treat water collecting in the underground storm water system.  (Docket No. 93-1 ¶¶ 3-4.)  Water was treated and discharged pursuant to a permit issued by the Town of Tonawanda.  (Id.) Water from pits inside the Forge Facility also has been pumped and treated through the E-COM system.  (Id. ¶ 8.)  As of June 26, 2012, all pits but one had been pumped, cleaned, and backfilled in accordance with DEC instructions.  (Id.; Docket No. 93-2 ¶ 6(b).)

In the first week of May 2012, Empire, a contractor working for the DEC, began installing its own on-site water treatment system.  (Docket No. 93-1 ¶ 5.)  The DEC is using its system to treat wastewater pumped from the now-closed storm sewer system, and the E-Com system remains in place to treat storm water, as necessary.  (Id. ¶¶ 7, 10.)  Titan is working with the DEC to break up and remove from the site the surface materials that were contaminated by the transformer spill.  (Docket No. 93-2 ¶ 6(a).)

Both GM and E-COM agree that the on-site tank filtering systems are not a long-term solution.  (Docket Nos. 82 ¶ 38; 93-1 ¶ 10.)  E-COM intends to decommission its system once surface storm water is PCB free.  (Docket No. 93-1 ¶ 10.)

On May 1, 2012 the DEC issued a Notice of Hearing to Lewis Bros. and Samuel Lewis to consider the assessment of penalties and any other appropriate remedial or corrective actions with regard to their breach of the stipulation for clean up of the August 2009 Spill No. 0911809.  (Docket No. 83 Ex. 18.)

**B.     The Complaint and Preliminary Injunction Motion**

GM alleges that Lewis Bros. has violated various covenants, conditions and restrictions in the 1994 deed (GMC to AAM), the 2008 deed (AAM to Lewis Bros.), which prohibit it from using the Forge Facility premises for the treatment, storage or disposal of

9

hazardous or toxic materials, substances, or wastes.  GM claims: (1) damages relating to the alleged deed violations and also seeks an order permanently enjoining Lewis Bros. from future deed violations, (2) damages relating to various alleged breaches of the 2008 Assignment Agreement, including property damage as a result of PCB contamination, (3) amounts owed by Lewis Bros. for services Plaintiff rendered under the Wastewaters and Services Agreements, (4) entitlement to recovery for billed and unbilled services rendered under theories of implied contract and quantum meruit, (5), unjust enrichment, (6) trespass, (7) private nuisance, (8) CERCLA liability, (9) New York Navigation Law violations, and (9) fraudulent conveyances in violation of New York Debtor and Creditor Law as to Defendant Lewis Bros.  The Complaint also asserts CERCLA, Navigation Law, and breach of fiduciary duty claims as to one or both of the individual defendants.

In addition to monetary relief, The Complaint seeks, a declaration that restrictive covenants in the 1994 and 2008 Deeds, prohibiting the treatment, storage, or disposal of hazardous materials, are enforceable; an order requiring Lewis Bros. to remediate its property, an order appointing a receiver to oversee activities necessary to ensure the foregoing; and a declaration of Defendants' CERCLA liability that will be binding on subsequent actions.

In its subsequent motion for a preliminary injunction and appointment of a receiver, GM requests an order, without security, directing Lewis Bros. to: (1) prepare and submit a Best Management Practices ("BMP") Plan consistent with requirements for the Engine Plant's SPDES permit; (2) take all steps necessary to prevent PCB's and other hazardous substances from being released to Engine Plant property; (3) reconfigure its storm sewer so that it does not carry contaminants to the Engine Plant property or cause flooding and

sheet flow that interferes with Engine Plant property and operations; (4) and carry out all tasks necessary, under the not-yet-prepared BMP, to locate and address potential sources of hazardous substances. (Docket No. 15.)   In various supporting documents, GM states that it also seeks: to enjoin further material breaches of restrictive covenants in the December 3, 2008 Deed (AAM to Lewis Bros.) and the February 28, 1994 Deed (GMC to AAM),  (Docket No. 19 at 11-12), an injunction directing compliance with the Deeds and all agreements reference therein, as well as the Stipulation between Lewis Bros. and the DEC (Docket No. 18 ¶ 40); and specific enforcement of section 4.5 of the Wastewaters Agreement (Docket No. 83 ¶ 30).

## III.  DISCUSSION

### A.    Legal Standards Applicable to Preliminary Injunctions

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997).  A court may issue a preliminary injunction only if the moving party has demonstrated "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor."  Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010) (alteration in original) (internal quotations omitted); *see also* Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than

actual success."). The purpose of a preliminary injunction is to prevent hardship and preserve the status quo until final determination of the action. *See* WarnerVision Entm't v. Empire of Carolina, Inc., 101 F.3d 259, 261-62 (2d Cir. 1996).  The plaintiff must also demonstrate that he is likely to suffer "irreparable injury in the absence of an injunction." Salinger, 607 F.3d at 80 (quoting Winter v. Nat. Res. Def. Council, 555 U.S. 7, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)).  Irreparable injury is one for which a "monetary award cannot be adequate compensation."  Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir. 1995) (internal quotations omitted).  A court may not "simply presume" irreparable injury, Salinger, 607 F.3d at 82, but must "actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits."  Id. at 80.

Whereas a preliminary injunction preserves the status quo, a "mandatory injunction" either alters the status quo by "commanding some positive act," or by providing the plaintiff with substantially all the relief sought, which relief cannot be undone even if the defendant prevails on the merits.  Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33-34 (2d. Cir. 1995).  As a result, a plaintiff who seeks a mandatory injunction is required to meet a "more rigorous likelihood-of-success standard." Nicholson v. Scoppetta, 344 F.3d 154, 165 (2d Cir. 2003) (quoting Fair Hous. in Huntington Comm., Inc. v. Town of Huntington, 316 F.3d 357, 365 (2d Cir. 2002)) (additional citation omitted).  As the Second Circuit has stated, mandatory preliminary injunctions should issue only upon a clear showing of entitlement to the relief requested, or where very serious damage will result if the request for preliminary relief is denied.  Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) (quoting Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010)).  Under this standard, the "traditional

formula" for a preliminary injunction is altered by the requirement that "the movant demonstrate a greater likelihood of success [on the merits]." Tom Doherty Assocs. v. Saban Entmt't, Inc., 60 F.3d 27, 34 (2d Cir. 1995).  Of course, as with a traditional preliminary injunction, the plaintiff also is required to demonstrate irreparable harm. *See* Daly v. U.S. Fencing Assoc., No. CV 07-1167, 2007 U.S. Dist. LEXIS 28092, at *7 (E.D.N.Y. Apr. 16, 2007) (citations omitted).

In this action, GM's various requests for injunctive relief does not seek solely to maintain the status quo.  In addition, GM seeks: to reimpose duties it claims existed under agreements it has since terminated (i.e., preparing a BMP), and to impose new duties it has not alleged exist under any agreement between it and Defendants (i.e., compliance with a DEC stipulation).  Although not addressed by either party, the court finds that GM is actually requesting the issuance a mandatory injunction to which the heightened standard applies.

**B.     GM's Request for a Preliminary Injunction**

GM contends that Lewis Bros. has been sending PCB contaminated oil to the Engine Plant property and that the contamination threatens GM's SPDES permit, the Niagara River, and public health.  GM urges that environmental injury, by its very nature, is often irreparable and can seldom be adequately remedied by money damages. Moreover, GM argues, Lewis Bros. acknowledged in the deed from AAM to Lewis Bros. that the breach of any covenant or restriction therein would result in irreparable harm and that injunctive relief would be appropriate.

In response, Lewis Bros. argues that GM may not have standing to bring this action,

13

has not established a likelihood of success on the merits, cannot rely on contractual language to establish irreparable injury, has failed to establish an actual and imminent risk of irreparable injury, and, to the extent GM claims a risk from surface flooding, it has created that very risk by plugging the storm sewer flowing from the Forge Facility.

### 1.    *Standing*

As an initial matter Lewis Bros. contends "it is by no means clear that Plaintiff has standing to bring this action" because the documentation submitted with GM's motion papers shows the Engine Plant was conveyed from General Motors Corporation to General Motors Company, and not to General Motors LLC.  In reply, GM submitted proof of its October 16, 2009 conversion from the corporation known as General Motors Company to the limited liability company now known as General Motors LLC.  Lewis Bros. does not suggest, in its further submission, that this showing is inadequate.  On the current record, this Court is satisfied that General Motors LLC is the current owner of the Tonawanda Engine Plant property, such that it has standing to bring this action.

### 2.    *Irreparable Harm*

"'To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. And, irreparable harm must be shown to be actual and imminent, not remote or speculative.'" Parry v. Haendiges, 458 F. Supp. 2d 90, 94-95 (W.D.N.Y. 2006) (quoting Kamerling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002)).

14

a.   *Contractual Acknowledgment*

GM first argues that the Deed from AAM to Lewis Bros. expressly provides that a breach of any covenant or restriction will result in irreparable harm, thereby obviating the need for further analysis.

It is well-established in this Circuit, however, that a conclusory contract provision alone cannot establish irreparable harm.   "[C]ontractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate." Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987).   Rather, courts must perform a standard inquiry into the existence of irreparable injury and simply use the contractual provision as one factor in its assessment.   *See, e.g.*, Life Techs. Corp. v. AB Sciex PTE, Ltd., No. 11 Civ. 325, 2011 U.S. Dist. LEXIS 40586, at *13-14 (S.D.N.Y. Apr. 11, 2011) (considering contractual language as a non-dispositive part of its irreparable harm analysis); Sarwil Assocs., L.P. v. Steinbach Stores, No. 96-CV-591, 1996 U.S. Dist. LEXIS 7177, at *3, 8 (N.D.N.Y. May 14, 1996) (parties' agreement stating that any violation or threatened violation of it terms and conditions would have no adequate remedy at law did not control court's irreparable injury determination).

Thus, even presuming GM has shown a clear or substantial likelihood of success, reliance on this contractual provision alone is insufficient.

b.   Presumption of Irreparable Harm

GM next suggests that irreparable injury should be presumed because the Supreme Court has stated that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*,

15

irreparable." <u>Amoco Prod. Co.</u>, 480 U.S. at 545, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987). However, by its plain terms, this statement does not amount to a presumption.[5]  Indeed, the Supreme Court went on to reverse the Ninth Circuit's entry of a preliminary injunction, finding the anticipated environmental injury "was not at all probable." <u>Id</u>.  In short, plaintiffs alleging an environmental injury must show a sufficient likelihood that the harm will occur, and that such harm is actual and imminent.  While a plaintiff need not prove that future environmental harm *will* occur, the movant must show that "irreparable injury is *likely* in the absence of an injunction." <u>Winter v. NRDC, Inc.</u>, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) (emphasis in original).

      c.     <u>Likelihood of Irreparable Environmental Harm</u>

According to GM, PCB releases from the Forge Facility threaten to overwhelm GM's stormwater management systems, thereby causing its releases to the Niagara River to violate its SPDES permit.  GM urges that, if it is unable to return the water it uses to the Niagara River, the Engine Plant cannot operate.

Here, GM has offered evidence of four instances in which oily surface water flowed from the Forge Facility to GM's property.  The incidents occurred on or about September 2, 2009, January 3, 2010, June 3, 2010, and December 19, 2011.  GM recorded elevated concentration of PCBs at the CPI on several occasions around the time of the first incident—from August 2009 to October 2009.  (Docket No. 30, Ex. 5.)  Fortunately, there have been no permit exceedences, to date.  Nevertheless, GM based its motion on a legitimate and understandable concern of future exceedences.

---

[5] Indeed, the Supreme Court expressly rejected the Ninth Circuit's presumption of irreparable injury, finding "the environment can be fully protected without this presumption."  480 U.S. at 544-45.

While the Court acknowledges those concerns, it must base its determination on the current state of affairs.  GM has cut off the water supply to the Forge Facility and has plugged the storm sewers flowing from the Forge Facility to GM's property.  These actions, while certainly not a permanent solution, were taken for the very purpose of minimizing GM's risk of irreparable harm.  And while Lewis Bros.' apparent indifference to GM's and the DEC's concerns resulted in unnecessary delay, the record indicates that the known sources of contamination have been or are being abated.  All storm water and wastewater is being pumped and separated in accordance with applicable permits, excavations have, for the most part, been pumped, cleaned and filled, and contaminated materials are being removed from the site under DEC supervision.  It is of no consequence, for purposes of this request for injunctive relief, whether that work is being carried out by Lewis Bros. or the DEC.  The clean-up activities that have taken place or are scheduled to take place significantly diminish the likelihood that the harm identified by GM—intrusion of its stormwater system and violation of the SPDES permit—will occur.

GM contends that injunctive relief remains appropriate because the tank-based treatment system Lewis Bros. is employing is not a permanent solution.  The Court finds this is not a sufficiently compelling reason upon which to grant the extraordinary remedy of injunctive relief, even assuming a likelihood of success on the merits.  While clearly not a permanent solution, it is anticipated the treatment system will stay in place until storm water flowing across the Forge Facility is PCB-free.  As long as a storm water pumping and treatment system remains in operation, the threat of surface flooding onto the Engine Plant property is remote and speculative, not actual or imminent.

Considering all of these circumstances, I find GM has not shown there presently

exists a threat of irreparable harm that would warrant the sweeping relief requested.

**3.    *Likelihood of Success on the Merits***

Absent a finding of irreparable harm, there is no need to consider whether GM has sufficiently established it is likely to succeed on the merits.

**C.    GM's Request for Appointment of a Receiver**

Apart from a preliminary injunction, GM questions Lewis Bros.' financial stability and its ability to manage the Forge Facility property in an environmentally responsible manner. It seeks the appointment of a receiver to "prevent Lewis Bros. from diverting assets, exacerbating its insolvency, and depleting the resources available to perform the costly maintenance necessary to prevent PCB contamination."  (Docket No. 19 at 1.)

In support of its request, GM points to the facts that Lewis Bros. failed to provide a BMP plan, pay GM more than $500,000 it claims Lewis Bros. owes for past utility usage, pay property taxes on the Forge Facility, or maintain the property.  GM has concluded that Lewis Bros. is insolvent and is diverting rent and scrap monies it has received from the Forge Facility away from proper corporate purposes, thereby diminishing its ability to manage the property.  GM stated its intent to obtain evidence of Lewis Bros.' assets and liabilities prior to the preliminary injunction hearing.  (Id. at 9-10.)

During the time in which this motion has been pending, GM filed two motions to compel relating to its requests for financial information.  (Docket Nos. 50, 63.)  Its second motion was granted on July 31, 2012, and Lewis Bros. was directed to provide the requested information within 20 days thereafter—on August 20, 2012.

Assuming Lewis Bros. complied with the Court's directive, it is likely GM is still in the

process of reviewing those records.   Nevertheless, at this juncture, GM's motion for

appointment of a receiver is denied.

> Recognizing that appointment of a . . . receiver is an extraordinary remedy
> which results in the taking and withholding of possession of property from a
> party without an adjudication on the merits, [ ] courts have required the party
> seeking the remedy to make a clear showing that the appointment is
> necessary to prevent irreparable injury to the property interests at stake.
> Factors to be considered by the court in making the determination whether
> to appoint a receiver include [ ] fraudulent conduct on the part of the
> defendant; imminent danger that the property will be lost, diminished in
> value, or squandered; the inadequacy of available legal remedies; the
> probability that harm to the plaintiff by denial of the appointment would be
> greater than the injury to the parties opposing the appointment; the plaintiff's
> probable success in the action and the possibility of irreparable injury to
> plaintiff's interests in the property; and whether the interests of the plaintiff
> and others sought to be protected will in fact be served by receivership.  In
> the absence of clear proof of the danger of irreparable loss or damage, and
> proof that a receiver is necessary for the protection of the parties to the
> action and their interests, a temporary receiver should not be appointed.

Altissima Ltd. v. One Niagara, LLC, No. 08-CV-756, 2009 U.S. Dist. LEXIS 39472, at *2-4

(W.D.N.Y. May 8, 2009) (internal citations and quotation marks omitted) [alterations

added].

As determined above, GM has not shown that there presently exists a sufficient

likelihood of irreparable harm to warrant issuance of a preliminary injunction.  The standard

for appointment of a receiver is even more onerous, as a receiver should be appointed only

upon "clear proof of the danger of irreparable loss or damage."   Groh v. Halloran, 86

A.D.2d 30, 33 (1st Dep't 1982).

Based on the evidence and arguments received to date, the Court is not convinced

that the appointment of a receiver is necessary to prevent irreparable injury to GM's

interests.  While Lewis Bros.' documented delays in this case do not cast it in a favorable

light, it is now working with the DEC to remove hazardous substances from the site.

19

Beyond that, GM has not shown fraudulent conduct by Defendants, nor is the Court convinced a receiver is necessary for the protection of GM's interests.  The appointment of a receiver at this point could interrupt the work presently taking place and thereby impair both parties' interests.  Accordingly, GM's motion is denied in this regard, as well.

## IV.  CONCLUSION

For the reasons stated, GM's motion for a preliminary injunction and for the appointment of a receiver is denied.  Because there is the possibility that a more complete financial record or subsequent conduct by Lewis Bros. may alter the circumstances that now exist, the dismissal is without prejudice.

## V.  ORDERS

IT HEREBY IS ORDERED that Plaintiff General Motors LLC's Motion for Preliminary Injunction and for the Appointment of a Receiver (Docket No. 15) is DENIED.


SO ORDERED.


Dated:       August 31, 2012
             Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        Chief Judge
                                        United States District Court