UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GENERAL MOTORS LLC,

                Plaintiff,

v.                                                                            **DECISION AND ORDER**

LEWIS BROS., L.L.C., SAMUEL LEWIS and        10-CV-725S
TIMOTHY LEWIS,

                Defendants.

## I.  INTRODUCTION

Plaintiff General Motors LLC ("GM") commenced this action on September 2, 2010, seeking to recover, among other things, costs it has incurred responding to environmental contamination at its property allegedly caused by Defendants' unlawful release of hazardous substances.

Presently before this Court is Plaintiff's Motion for Default Judgment, filed on January 8, 2014. (Docket No. 130). Defendants were afforded an opportunity to oppose the motion, but have not done so, and briefing is now closed. For the reasons discussed below, this Court finds that an entry of default judgment is warranted.

## II. BACKGROUND

### A. Factual Background

The extensive facts in this case have been discussed in prior opinions[1] and are repeated here only to the extent relevant to the pending motion. Lewis Bros. owns a parcel of property in Tonawanda, New York that previously was part of a larger tract of land owned by GM. GM once operated both an Engine Plant and a Forge Facility on the property. The Engine Plant and Forge Facility shared utilities, including a system that drew "mill water" from the Niagara River to cool machinery and for fire protection.

The used mill water, along with storm water and wastewater from both operations, was collected in a shared storm sewer, sent to a corrugated plate interceptor ("CPI"), and returned to the Niagara River as allowed under a New York State Pollutant Discharge Elimination ("SPDES") permit. The electric power needed to run both facilities was managed by a primary electric substation.

In 1994, GMC sold the parcel on which the Forge Facility is situated to American Axle and Manufacturing, Inc. ("AAM"). Both the CPI and electric substation are located on the parcel GM retained—i.e., the Engine Plant site. GM and AAM agreed that, following the sale, GM would continue to provide utilities to AAM via the existing shared systems. The entities entered into a Tonawanda Services Agreement (the "Services Agreement"), a Tonawanda Wastewaters and Stormwater Services Agreement (the "Wastewaters Agreement"), an Asset Purchase Agreement ("APA"), and a Deed transferring title.

In 2008, AAM entered into a contract to sell the Forge Facility property to

---

[1] See Docket No. 97, Decision and Order on GM's Motion for Preliminary Injunction for a fuller discussion of the facts, with record citations.

Defendant Lewis Bros., and title was transferred on December 3, 2008. The 1994 deed from GM to AAM and the 2008 deed from AAM to Lewis Bros. contain covenants and restrictions that prohibit Lewis Bros. from using the property for the treatment, storage, or disposal of hazardous or toxic materials, substances, or wastes. As part of the AAM to Lewis Bros. property transaction, AAM, Lewis Bros., and GM executed an Assignment Agreement, assigning the Wastewaters Agreement and Services Agreement, as amended and modified, from AAM to Lewis Bros.

The GM Complaint alleges that, as of the filing date, there had been three occasions on which flood waters containing PCBs migrated from the Lewis Bros. property to the GM property in violation of various provisions in the deeds and agreements, statutory law, and common law. Following one such occasion, GM notified Lewis Bros. that it was in breach of the Assignment Agreement and GM was therefore terminating the Agreement. On July 9, 2010, GM shut off all electric service to the Forge Facility and turned off the mill and firewater supply. It also plugged storm sewer pipes from the Forge Facility at the property line.

In early 2010, the New York State Department of Environmental Conservation ("DEC") directed Lewis Bros. to contain and remove a petroleum spill that had occurred at the Forge Facility in or about August 2009. The DEC ultimately commenced remediation activities due to Lewis Bros.' inaction. After a further PCB spill occurred on December 19, 2011, the DEC directed Lewis Bros. to begin treating contaminated water collecting on the property. Lewis Bros. engaged a contractor to operate an on-site water treatment system. As of late June 2012, water that had collected in low areas, trenches, and pits had been pumped and treated, all pits had been cleaned in accordance with DEC

instructions, and all but one had been backfilled.

In May 2012, the DEC retained its own contractor to operate a second on-site treatment system. While the Lewis Bros. contractor treated ponded surface water, the DEC contractor treated water that was collecting at the Forge Facility in the plugged storm sewer pipes.

### B. Procedural Background

GM commenced this action on September 2, 2010, asserting twelve claims for relief: (1) enforcement of restrictive covenants, (2) breach of contract, (3) for account stated, (4) breach of implied contract or quantum meruit, (5) unjust enrichment, (6) trespass, (7) private nuisance, (8) recovery of response costs under CERCLA section 107 from Lewis Bros. as owner of contaminated property, (9) recovery of response costs under CERCLA section 107 from Samuel Lewis as operator of a facility, (10) recovery of cleanup and removal costs under New York Navigation Law, (11) avoidance of fraudulent conveyances under New York Debtor and Creditor Law, and (12) breach of fiduciary duty by directors and officers of an insolvent corporation.

Defendants, through counsel, filed an answer on December 13, 2010. On March 14, 2011, GM moved for a preliminary injunction and appointment of a receiver.

Defendants' attorney moved to withdraw as counsel on September 21, 2011. The motion was denied on October 18, 2011. Thereafter, counsel filed a motion to compel on Defendants' behalf, opposed GM's motion for preliminary injunction[2], and opposed a GM motion to compel. Counsel filed a second motion to withdraw on January 23, 2012, which was granted on February 22, 2012.

---

2 GM's motion was later denied without prejudice. (Docket No. 97.)

This Court subsequently scheduled a status conference for May 7, 2012, noted that Lewis Bros. was not represented, and directed that new counsel for the corporate defendant enter an appearance prior to the conference. No Defendant appeared on May 7, 2012, and only Defendant Samuel Lewis appeared at the next scheduled conference. This Court scheduled a further conference for June 1, 2012, and again directed that the corporate defendant must appear by counsel.

New counsel entered an appearance on behalf of all Defendants on May 31, 2012, and proceeded to respond to outstanding motions. However, less than one year later, on April 12, 2013, counsel moved to withdraw due to Defendants' ongoing failures to communicate and cooperate with him regarding discovery and other aspects of the litigation. The motion to withdraw was granted on May 23, 2013.

On June 27, 2013, Magistrate Judge Leslie G. Foschio, to whom this case was referred for the conduct of discovery and other nondispositive matters, issued a Decision and Order (Docket No. 121) on GM's third motion to compel and for sanctions (Docket No. 98). That Decision provides a detailed history of Defendants' ongoing failure to respond to discovery and comply with court orders, including while represented by counsel. Based on "the unmitigated and abusive failure of Defendants to fully and timely provide all outstanding discovery as directed," the Magistrate Judge imposed as a sanction two adverse inferences: "(1) during the relevant period Lewis Bros. was and remains insolvent and (2) [ ] Defendants, particularly Samuel Lewis and Lewis Bros., have been and are diverting, to third-parties, hundreds of thousands, perhaps millions, of dollars received by Lewis Bros. from the demolition and recycling work conducted at the forge facility based on fictitious transactions or inadequate consideration, thereby

5

perpetuating a fraud on Plaintiff as a putative creditor of Defendants caused by Defendants' breach of the agreements." (Docket No. 121 at 12-13).

Thereafter, this Court again ordered that Lewis Bros. must appear by counsel, and scheduled a status conference for November 1, 2013, effectively providing Lewis Bros. nearly six months to retain new representation. Defendants were warned, as they had been on at least two prior occasions, that their failure to appear may result in the entry of default. When no Defendant appeared, this Court directed the entry, which Defendants did not seek to vacate.

GM moved for default judgment on January 8, 2014. Defendants were afforded an opportunity to oppose the motion, but did not do so. They have given no other indication of intent to defend the case.

## III. DISCUSSION

### A. Default Judgment Standard

A defendant's default is deemed to constitute a concession of all well-pleaded allegations of liability, but is not considered an admission of damages. Greyhound Exhibitgroup v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992) (citing Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)).  Thus, while a finding of liability can be predicated solely on a facially valid complaint, damages must be proven before a final default judgment is entered.  See Credit Lyonnais Securities (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

Default judgment converts the defaulting party's admission of liability into a final

judgment that terminates the litigation and awards the plaintiff the relief to which the court determines it is entitled. City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 128 (2d Cir. 2011).

> The court may conduct hearings or make referrals—preserving any federal statutory rights to a jury trial—when, to enter or effectuate a judgment, it needs to:
> (A) conduct an accounting;
> (B) determine the amount of damages;
> (C) establish the truth of any allegation by evidence; or
> (D) investigate any other matter.

Fed. R. Civ. P. 55(b)(2).

In short, a district court must confirm the plaintiff has pled sufficient facts to support its claims, and then must ascertain with reasonable certainty the amount of damages owed. House v. Kent Worlwide Mach. Works, Inc., 359 Fed. Appx. 206, 207 (2d Cir. 2010) (citing Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997)); Wagstaff-EL v. Carlton Press Co., 913 F.2d 56, 57 (2d Cir. 1990) (affirming vacatur of default judgment where underlying claims were facially invalid or utterly unsupported, and appellant's calculation of damages was preposterous). Damages may be determined without a hearing so long as the pleadings and evidence on which the court relies, which may be supplemented by the judge's personal knowledge of the record gained during the litigation, support the calculation. Transatlantic Marine, 109 F.3d at 111 (citing Tamarin v. Adam Caterers, Inc., 13 F.3d 51, 54 (2d Cir. 1993)). The relief available on a default judgment is limited by Rule 54(c) of the Federal Rules:

> A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.

District courts must also bear in mind the Second Circuit's strong preference for resolving disputes on the merits. The Circuit Court has described default judgment as the most severe sanction the court may apply and one reserved for rare occasions. Mickalis Pawn Shop, 645 F.3d at 129 (citations omitted). Moreover, where there is doubt as to the propriety of default relief, "the doubt should be resolved in favor of the defaulting party." Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993).

**B. GM's Motion**

The categories of relief GM seeks on this motion are as follows: (1) contract damages arising from breaches of the Services Agreement; (2) contract damages arising from breaches of the Wastewaters Agreement; (3) damages in the form of response costs under CERCLA and New York Navigation Law; (4) declaratory relief regarding future response costs; and (5) declaratory relief relative to Lewis Bros.' fraudulent transactions and breaches of fiduciary duties by Samuel and Timothy Lewis; (6) attorneys fees; and (7) the appointment of a receiver. (Docket No. 155.)

1. Present Damages

GM seeks default judgment with regard to damages it already has incurred under the Services and Wastewaters Agreements, CERCLA, and the New York Oil Spill Law.[3]

I have reviewed in detail GM's relevant allegations; the affidavits of Miguel Antonetti, environmental supervisor at GM Tonawanda, sworn to January 8, 2014 (Docket No. 131), April 28, 2011 (Docket No. 30), and February 8, 2011 (Docket No. 17), with annexed exhibits; the affidavit of Gary J. Londo, acting facility manager at GM

---

3 Article 12 of the New York Navigation Law, §§ 170 et seq.

Tonawanda, sworn to February 28, 2011, with annexed exhibits (Docket No. 16); and the Affirmation of R. Hugh Stephens, Esq., dated January 8, 2014, with annexed exhibits (Docket No. 141). Based on this review, I find GM's initial allegations, which are supported by facts developed over the course of litigation, provide a sufficient basis for GM's claims that Defendants breached various provisions of the Services and Wastewaters Agreements, failed to pay amounts billed under the Agreements, and permitted PCB-contaminated water to flow onto GM's property, such that GM incurred costs in response to releases and/or the threatened release of hazardous substances under CERCLA and the New York Oil Spill Law (Claims II, VIII, IX, X).[4]

Further, this Court finds no reason to question the authenticity and accuracy of the affidavits, agreements, invoices, and other supporting documentary evidence relative to damages. They support a finding that sums were billed and/or incurred by GM in connection with the breach of contract and statutory claims in the amount of $784,579.57.[5] See Eastman Kodak Co. v. Berkshire-Westwood Graphics Group, Inc., No. 09-CV-6185, 2010 U.S. Dist. LEXIS 66839, at * (W.D.N.Y. July 6, 2010) (awarding damages without a hearing where damages were susceptible to mathematical computation).

---

[4] GM contends its various common law claims also support judgment in its favor with regard to the same amounts. Given the availability of relief under the contractual and statutory claims, the Court finds no need to assess the viability of these common law causes of action.

[5] This sum includes: (1) $434,569.51 that was billed to Lewis Bros. under the Agreements for utility services during the period December 2008 through December 2009; (2) $18,976.90 to contain and dispose of PCB contamination at the Engine Plant Property that was released from the Forge Facility; (3) $107,052.00 incurred by GM to plug storm sewer connections between the Forge Facility and the Engine Plant; (4) $114,132.00 incurred by GM to cut and cap the firewater system between the Forge Facility and the Engine Plant; (5) $23,275.00 incurred by GM to repair curbing and install a clay berm along the Forge Facility's north perimeter to prevent the flow of storm water onto GM property; and (6) $86,574.16 to install a sump pump system to protect GM's primary electric substation from storm water migrating from the Forge Facility.

2. Contractual Interest

GM has established that it billed $434,569.51 to Lewis Bros. for utility services provided through December 2009. The Complaint also seeks related damages incurred after June 2010. (Docket No. 1 ¶ 116.)

Both the Services Agreement and the Wastewaters Agreement provide that, in the event Lewis Bros. defaults on its payment of any amount due to GM under the Agreements, that amount will "bear interest at the announced and published prime rate of Chase Manhattan Bank, N.A. plus two percent (2%) per annum from ten [ ] days after [written] notice of such default . . . until such amount is paid." (Docket No. 131 Exh. 4 ¶ 7.6 and Exh. 5 ¶ 17.6.) By letter dated June 17, 2010, GM gave Lewis Bros. written notice of its default on payments due for utility services through December 2009, and of its obligation to pay interest under the Agreements. (Docket No. 16, Exh. 4.) This evidence is sufficient to support an award of interest at the rate of 5.25 percent per annum[6] beginning June 27, 2010 until the underlying amount of $434,569.51 is paid in full.

3. Future Expenditures

In addition to the amounts already billed or expended, GM seeks certain future costs for which it contends Defendants should be held liable. The requested amount is substantial. First, GM seeks $80,000 as "[t]he cost of the final capping of the Mill Water." (Docket No. 131 ¶ 26.) Support for this "sum certain" is in the form of an email from Gary Londo, GM's Acting Facility Manager, who states that "the site doesn't have final quotes on this work, but an amount of no more than 80,000 should be sufficient." (Id. Exh. 13.)

---

[6] GM states, upon information and belief, that the Chase Manhattan Bank Prime Rate since June 27, 2010 has been 3.25 percent. This Court takes notice that said Prime Rate has remained at 3.25 percent since December 16, 2008.

Next, GM requests $45,000 to pay for a fence it is planning to erect "around the Engine plant facility to protect its employees from the contamination at the Forge facility." (Id. ¶ 30.) GM again refers to the Longo email, which states that "[a]n engineering quote for about 45,000 for fence relocation is all that I can give you at this point." (Id. Exhs. 13, 15.) The next item involves electric service to the Forge Facility, which GM ceased providing on July 9, 2010. GM attests that it plans to remove the now dormant cables up to its property line at an estimated cost of $33,000.00. (Id. ¶¶ 27-28, Exh. 14.) Finally, GM asserts that when the DEC became involved in remediation at the Forge Facility, it erected berms that are not sufficient to prevent overflows onto the Engine Plant property. GM expects this will require the construction of a "slurry wall." It provides no evidence to support its cost estimate of $250,000.

Compounding the conclusory nature of these requests, GM offers no authority to support the inclusion of potential future costs in a default judgment. See, e.g., JDS Two, LLC v. Sapp, No. 3-12-0349, 2013 U.S. Dist. LEXIS 32392, at *6 (M.D. Tenn. Mar. 4, 2013) (declining to award future costs provided for in promissory and guaranty notes where plaintiff provided no authority for including future costs in default judgment), United States ex rel. Parker Sheet Metal v. Contractor's Bonding and Ins. Co., No. 11-CV-00745, 2012 U.S. Dist. LEXIS 31063, at *9 (D. Colo. Mar. 8, 2012) (rejecting request for future costs of collection on ground costs were indeterminable at time of default judgment); Greystone Bank v. St. John Apts., LLC, No. 11-CV-01291, 2012 U.S. Dist. LEXIS 25544, at *2-3 (W.D. Tenn. Feb. 28, 2012) (rejecting magistrate judge's recommendation that default judgment include future collection costs on ground that such an award must be based on itemization of costs and supporting affidavit after they are incurred).

As noted previously, a default judgment cannot differ in kind from what is demanded in the pleadings. Fed. R. Civ. P. 54(c). While GM's Complaint clearly requests monetary relief for damages it has incurred, its requests in connection with potential events are solely in the form of declaratory relief. Even assuming GM were able to show that these anticipated expenditures will arise under the claims asserted in the Complaint at a cost provable with reasonable certainty, this Court cannot convert its demand for declaratory relief to one for monetary relief by way of a default judgment.

4. Declaratory Relief

GM alleges that there have been releases of hazardous substances as defined in CERCLA at the Forge Facility, and that those releases continue to pose a threat of contamination to the Engine Plant Property. (Docket No. 1 ¶¶ 168-69.) It seeks a declaratory judgment as to Lewis Bros.' liability, binding on subsequent actions, for CERCLA response costs GM may incur in the future due to those releases. (Id. ¶ 172, wherefore clause (k).) In defaulting, Lewis Bros. admits liability for past releases that pose an ongoing threat. Thus, a declaratory judgment holding Lewis Bros. liable for future CERCLA damages incurred by GM from those releases is granted.

5. Joint and Several Liability

GM acknowledges that the damages it seeks ordinarily would be recoverable only against Defendant Lewis Bros. It urges, however, that the individual defendants used Lewis Bros. "to enrich themselves at the expense of [Lewis Bros.'] creditors," and should be held personally liable for GM's damages due to their breaches of fiduciary duty and

fraudulent conduct.[7] (Docket No. 155 at 3.) To the extent it was able, GM pled facts regarding Defendants' conduct in the Complaint. Since then, based on Defendants' repeated failure to produce financial records in discovery, the Court imposed on Defendants the adverse inferences that: (1) Lewis Bros. is insolvent, and (2) Defendants have been and are diverting to third-parties, hundreds of thousands, perhaps millions, of dollars received by Lewis Bros. from demolition and recycling work conducted at the forge facility based on fictitious transactions or inadequate consideration, thereby perpetuating a fraud on GM as a creditor of Defendants. In defaulting, Defendants concede the allegations in the Complaint (fraudulent conveyances of rents received) and the adverse inferences (fraudulent conveyances of payments received from demolition and recycling work). Accordingly, Defendants Lewis Bros., LLC, Samuel Lewis, and Timothy Lewis are held jointly and severally liable for amounts recoverable on this default judgment.

6. Appointment of a Receiver

In its Complaint, GM requested that the Court appoint a receiver to oversee activities at the Forge Facility it anticipated the Court would direct Lewis Bros. to undertake at the conclusion of litigation. In its subsequent Motion for Preliminary Injunction and for the Appointment of a Receiver (Docket No. 15), GM urged that a receiver was necessary to prevent Lewis Bros. from diverting assets and exacerbating its insolvency (Docket No. 19 at 1). This Court denied the motion, noting that such an appointment should be made sparingly and only upon clear proof of the danger of irreparable loss or damage. (Docket No. 97 at 19.)

---

7 The request for joint and several liability relates to GM's claims for avoidance of fraudulent conveyances under New York's Debtor and Creditor Law and for breach of fiduciary duty.

GM contends that the appointment of a receiver is appropriate now due to Defendants' admissions, through their default, that they released hazardous substances, breached their contracts with GM, and made fraudulent conveyances. But, the appointment of a receiver is not predicated on a finding of liability against the opposing party; rather, the moving party must make a clear showing that the appointment is necessary to prevent irreparable injury to its property interests. Though certain of Defendants admissions involve factors a court will consider in making the determination whether to appoint a receiver, GM has made no attempt to show that a balance of all factors weighs in its favor and that it is at risk of irreparable loss or damage.[8] (Id. at 18-20.) Accordingly, the request for appointment of a receiver is denied.

7. Attorney's Fees

Finally, GM "seeks reimbursement for attorney's fees and costs under Rule 54(d) of the Federal Rule of Civil Procedure." (Docket Nos. 155 at 11.) GM has not given the Court an accounting of its costs. To the extent GM seeks attorney's fees, such request must be by a motion containing the information specified in Rule 54(d)(2)(B), along with records sufficient to permit the Court to conduct the requisite fee assessment. See e.g., Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. Of Albany, 522 F.3d 182, 186 (2d Cir. 2008). No such information has been provided.

---

[8] By way of affidavits, GM suggests that it is at risk of harm because work necessary to protect the Engine Plant must be performed at the Lewis Bros. facility where GM cannot take action (Docket No. 141 ¶¶ 96-97) and so, the appointment of a receiver who can perform work at that facility is required (Docket No. 131 ¶ 39). These declarations are inconsistent with the Complaint which states that "[t]he 1994 APA [Asset Purchase Agreement] between GMC and AAM, the 1994 Deed from GMC to AAM, and the 2008 Deed from AAM to Lewis Bros. each provide an easement over the Lewis Bros. property in order that the owner of the Engine Plant property can take action to prevent or correct any violation of the APA or the Deeds." (Docket No. 1 ¶ 18.)

It is not clear to this Court whether GM intended its current request to constitute a Rule 54(d) motion, or whether it seeks a declaration that it is entitled to costs and fees in an amount to be determined on a future motion. The complete absence of supporting documentation suggests the latter, but because the nature of the request is unclear, it is denied without prejudice.

## IV.  CONCLUSION

GM's motion for default judgment is granted, and default judgment will be entered in favor of GM and against Lewis Bros., LLC, Samuel Lewis, and Timothy Lewis. GM is awarded the damages it incurred due to Defendants' breaches of contract and violations of CERCLA and the New York Oil Spill Law in the amount of $784,579.57. In addition, GM is awarded contractual interest on the $434,569.51 it billed to Lewis Bros. for utility services, at a rate of 5.25 percent per annum, from June 27, 2010 until the underlying amount is paid in full. Defendants Lewis Bros., LLC, Samuel Lewis, and Timothy Lewis are jointly and severally liable for the foregoing awards. In defaulting, Defendants concede liability for future CERCLA costs GM may incur due to Defendants' releases of hazardous substances at the Forge Facility. GM's requests for anticipated damages and the appointment of a receiver are denied, and its request for fees and costs denied without prejudice.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiff's Motion for Default Judgment (Docket No. 130) is GRANTED.

FURTHER, that Plaintiff is awarded $784,579.57 in damages.

FURTHER, that Plaintiff is awarded contractual interest on $434,569.51, at the rate of 5.25 percent per annum, from June 27, 2010 until the underlying amount is paid in full.

FURTHER, that the Clerk of Court is directed to enter judgment in accordance with this Decision and Order.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:   May 4, 2014
         Buffalo, New York

                                                  /s/William M. Skretny
                                                WILLIAM M. SKRETNY
                                                     Chief Judge
                                          United States District Court